Thank you, Your Honor, and good morning, Your Honors. Thomas Hudson on behalf of the plaintiff appellant Peter Faulkner and with me at council table today is Steve Dawson and I hope to save five minutes for rebuttal. Your Honors, if viewing the evidence and all inferences therefrom in the plaintiff's favor would permit a jury to find that an insurance carrier accepted a claim and then, after learning that the claim was expensive, engaged in an outcome-based investigation that led to the willful denial of a claim known to be valid, that is a case that should go to the jury and it is a case where the jury could find bad faith in the court of law. But what's the evidence? Well, thank you, Your Honor. We would submit that this is that case and that in discussing the evidence, I mean, what we're talking about here is what is the district court properly able to limit this pool of record to? Let's start with the first proposition. You've argued in the Federal Rules procedure, permit the court to consider, so it may consider, but why should the district court be expected to become the pig searching for truffles, looking at the record for something that wasn't actually put in front of it? And we don't suggest it should, Your Honor. Let me note, though. So will you limit the pool of evidence to that that was specifically identified to the district court? Absolutely. That's what I planned to discuss this morning, only evidence that the district court considered and evidence to which there was no objection sustained. So let's begin with the legal standard. The parties basically are in agreement that under Arizona law, an insurance company can be held liable for bad faith if it unreasonably investigates processes or evaluates a claim and does so either knowingly or unreasonably. And in the workers' compensation context, that standard becomes particularly important, and the insurance carrier's fiduciary duties become paramount because at the end of the day, the carrier's decision affects whether an injured worker receives health care. So in this case, what we have is the district court noted in its order at the outset WASA accepted the claim, and it did so after conducting its initial investigation. And at that time, it learned from its medical case manager, and this is in fact 26 in Judge Silver's order at page 8 and cited in our papers at page 6, that what Mr. Faulkner was describing to its employer and to the carrier, that he was injured on February 14th, was away from work for approximately 30 days, returned to work and his symptoms got worse, that that is common. That commonly happens due to a back injury. And it also learned, and this is critical, Judge Clifton, that what they were what WASA was told at that time is that unless another explanation can be found, that's in the claim file, fact 26, unless another explanation can be found, that his condition likely occurred as stated. In other words, unless another explanation can be found, the claim should be accepted and paid. And that's, in fact, what WASA initially did. It then became apparent that the claim was going to be expensive, that Mr. Faulkner likely was going to have to have back surgery. So that's when it ---- Let's take a look at that. Unless another explanation can be found, there is a gap in time between the incident, which by now has come to be acknowledged, took place on Valentine's Day, and the actual reporting of that claim. Correct. Why is it inappropriate for the insurance carrier to say, you know, there are lots of ways somebody could pull his back in the month-plus between the alleged date of the episode and the actual report of the injury. Why shouldn't we look into the possibility that he injured his back climbing under the roof of his garage or something else? Well, that's the unless another explanation can be found, Judge Clifton. Well, then why aren't they allowed to pursue that possibility? Ultimately, they have an obligation to give equal considerations to the insurer's interests. And he provided an explanation that made medical sense. That's what they were told. And then they go to the IME doc and ask the same question, is what he's saying, does that make medical sense? And the IME physician, Dr. Bagan, comes back and says the same thing, confirms what their medical case manager said. And this is cited by both parties. It's in Judge Silver's order. It's in the first IME report of May 15th. But I thought your argument was premised on, in essence, negligent investigation by the claims adjuster who had been provided with the name of the trainee who was working with your client when the injury occurred. The purported eyewitness. The purported eyewitness, but they never talked to him. Well, I think that's part of it. And we wouldn't submit that it's a negligent investigation. What really the key to the bad faith here is unreasonably denying a claim that they knew was valid. They had no evidence to deny. Don't you have a – the first set of questions by Judge Clifton seems to suggest that there was a valid justification or reason for further inquiry into the claim. The fact that they made an initial determination doesn't mean that they can't change their mind. Fair enough. So I think you're focusing too much on what happened prior to the time that they select their own person to do the test and what that person made his determination. I understand, and please correct me, the reason that it was ultimately denied is that they couldn't pin – they couldn't substantiate that an injury occurred in the workplace. Isn't that what ultimately – I don't think that's a – I don't think – That was a funny question. So you disagree with that? I do. I think that is viewing the evidence in the defendant's favor, which is the incorrect standard of review. And let me – let me – if I may, let me go over that and why this is so critical, why this initial acceptance, and unless another explanation can be found, they then do go to the IME and ask the medical question. That's fair investigation. Does it make medical sense? We'll note that it only happens once they learn it's expensive. But they ask, does it make medical sense? And they're told, yes, it does. I thought the IME initially told the claims adjuster that I can't tell you what the cause is because you haven't given me enough information here. All I have is the patient's explanation, but I can't tell from looking at him whether or not the injury occurred on February 14 or it occurred sometime in the – Well, he doesn't – he doesn't put it in those words, Judge Thomas. But isn't that the gist? That's another friendly question. Are you sure you want to say no? My goodness. The fellow is saying, this guy is injured. I just don't know whether it comes from this injury. Fair enough. And the other people have an eyewitness that they never tell this person again. Yes. That's absolutely true. So why are you arguing about the stuff that happened on the 6th day before man was created? And if it's – you're right, Judge Thomas, that that is in there. But there's other stuff in there as well, which they confirm, and this is what I was trying to note, is they say – I'm just trying to understand to get back to the question that Judge Clifton started us on. Right. What evidence do you have that supports bad faith? Because ultimately all these things were done, but as I understand the thrust of your So long before they did them, that by the time they did them, they recognized this was going to be a very expensive claim, and so therefore they biased the investigation in the manner in which they followed up on the leads that they ultimately followed up on. Right. Yeah, and that's part of – Is that your theory? It's certainly part of the theory, but I think the nugget – What's the other part? The other part is that when they denied the claim, the only thing that they – additional evidence they had. They did the first IME. It confirms what the case manager says. And you're right, Judge Tallman. What Dr. Bain was saying was missing was a fact. There wasn't any additional medical information needed at that point. He was saying if it occurred – if the events occurred as stated on the 14th, this is a claim you should accept. And they also knew at that time, unless another explanation can be found for the back injury, why he's suffering pain, the claim has to be accepted. They do then the May 30th IME. But then let's go back to Judge Clifton's question about the two-month gap – or maybe it was Judge Manobides – the two-month gap in the reporting, because that's probably the worst fact that you have to face here. And what's so unreasonable about how the insurance company adjusted the claim in being skeptical based on a two-month gap in reporting as to whether or not the injury actually occurred on February 14th or instead is explained by falling off his roof? Because if we view the facts in the plaintiff's favor, as we must, they were told, unless another explanation can be found, accept the claim. And then what happens – and this is what I'm saying is the nugget here – they get the second IME knowing that the doctor is not – there's no medical question. Their IME confirms it makes medical sense. The only question that's missing is what happened on the 14th. They don't talk to the eyewitnesses. They don't tell the IME doctor about them, even though he says that wouldn't have changed his opinion. And they then ask to – they specifically ask him to opine on the following. Here's the timeline. Let's assume he reports the injuries on the 14th. He doesn't report for this much for over 30 days. Returns to work. Symptoms get worse. Can you tell us is it industrial in origin? And he comes back and says, I can't tell you one way or the other. He says, I'm unable to determine based on that. So knowing that it's a fact issue, knowing that unless another explanation can be found, the claim should be accepted and paid. Unable to obtain another explanation and told by the IME doc, I'm unable to conclude, they then deny the claim. That's bad faith. A jury could find bad faith based on those facts alone. Let's assume that nothing more had been done. Are you saying that at the point they received the initial IME, had the denial of the claim at that point was bad faith? Absolutely. Because of what? An insufficient negligent investigation? Because they had no basis to deny the claim. They had accepted it and been told. They keep saying that. But it matters. But you're ignoring the two-month gap. But they knew about. And the IME who says, I can't tell you that this is a work-related matter. Right. Okay. So if we, again, let's view the facts in the plaintiff's favor. They knew about the two-month gap when the claim was accepted. And if you look at the claim was accepted, I mean. The claim was tender. They don't reject it out of hand. There are immediate benefits. It would be shocking if a carrier in the circumstance would simply say no from the first instance. So I don't think you've got much of a case based on a change of position. Your case is really based on at some point in time they had information that you argue they willfully disregarded. Prior to that time, I got a hard time seeing what the problem is. Well, they knew when the claim was reported about the gap. They knew when the claim was reported about the eyewitness. Assume, just for argument's sake, that what you think is not what this panel thinks. And that at that point in time, there has been no bad faith and that they don't really have a duty to pay something. So if you would you follow up on if assuming that at that point there's no bad faith claim, why the failure to investigate and the failure to tell the doctor about this investigation or that there's an eyewitness to the incident. Sure. How that combines to take it out of mere negligence and turn it into a bad faith claim. It's unreasonable and either reckless disregard or knowing. Okay. So they then deny the claim based on the IME report, even though it provides no new information. And they know that the IME doctor is the only thing he's missing. It's clear he's interested in the fact of what happened. They don't tell him about the eyewitnesses, even though it's clear that's going to affect his opinion. That's what he testifies to. That's fact 108, which the district court considered. And then what they do is force him to go, force him to hire an attorney and request a hearing at the industrial commission. Goes through that entire process and then the defense is asked by the ALJ, have you talked to your IME doctor? There's people who witnessed this, which they knew about. And they then go talk to him and accept the claim. So there was no new information that came out of that. That's a reasonable investigation. Any reasonable carrier that had any question whatsoever about the facts of the 14th would have investigated it before denying the claim. And the fact that they force him to continue is bad faith. What's the time frame here? They get the first IME and they say, okay. Yeah, they get the first. You say that basically there's a failure to immediately interview the eyewitness who they learned about. That's right. And that's And force the claimant to a hearing. So how much time are we talking about before they finally accepted the claim? Well, we would submit, Your Honor, it frankly doesn't matter how much time. It matters to me. That's what I'm asking the question. Okay. So that hearing, so the claim was denied on June 2nd and then From an injury that occurred on February 14th. February 14th. And so that period of time between month 2 and month 6 is, as a matter of law, way too long to investigate this claim and therefore must be in light viewed most favorable to the plaintiff prima facie of bad faith. I would like to save some time for rebuttal. But, Your Honor, you said as a matter of law. And again, I feel like I'm struggling with it. We're struggling with the standard review. We're struggling with the evidence. I mean, we're kind of back to the question that Judge Clifton started us off on. Right. You want to call it bad faith and four months is not a very long period of time. Yeah. We would submit. We would ask the court to look at nothing else. Look at Volume 8, Exhibit 8, the claim note from the medical case manager. So out of that four-month period, your client waited two before he reported the injury and the claim was finally accepted two months later? Have I got the time? You do. You do, Your Honor. But, but. You want to save some rebuttal time? I do. Thank you. All right. Counsel, if you would. I'm sorry. I'll let you set up. Could you give me a sheet? Thank you. I'm trying to hone in on this time frame and make sure I understand it. If we assume, what I want to find out is what was the time frame between the first report from your expert where he says, you know, I can't locate, I don't know about the how, where it happened or whatever I need, and when it was ultimately decided to go ahead and make the claim? In order to accept the claim? The report from your expert, that's the first. I'll call it the first report. That's May 15th, 2008, Your Honor. And that report, perhaps, because of what's said, maybe you could trigger an idea of, hey, we know about another witness. We know what he's interested in. We need to get this information to him. I'm not saying that makes it willful or anything like that, but I just want to know the time frame between that first report and when the company actually pays it. Because that may be less than even the four months that we're talking about. I can give you that time frame, I believe, Your Honor. By yourself, for the record, before you answer the question. James McShane. I represent Wausau Business Insurance Company. Thank you, Your Honor. Timing-wise, the first IME report from Dr. Begin was May 15th of 2008. The second one was May 30, 2008. And the record shows that Matt Smith, the adjuster, denied the claim based on the second IME report on June 2nd. So we've got a month. That's still the denial. That's for the denial. When is the claim ultimately acknowledged? Isn't that like December? It was. I believe it was December 8th. So that's like six or seven months later? Right. It was during the ICA litigation proceeding. Now, during the record, there is a transcript of a phone conversation between Mr. Smith of your client and the claimant that took place early April. April 8th, Your Honor. And the district court knocked that out for reasons, I confess, are not entirely clear to me. But your client acknowledged, or your client's claim adjuster acknowledged during his deposition the transcript was accurate. And in that transcript, it appears the claimant advised the company that there was an eyewitness. Is that correct? He did. He mentioned the name of Mr. Zeiger, who was the trainee that Judge Tallman mentioned. Well, if at that point your client knows there's an eyewitness to confirm the episode on Valentine's Day, what is missing in terms of the answer to the question posed in the second IME that I don't know if there was anything that happened on that day? When your client now knows there's an eyewitness that says something did happen on that day. The adjuster for Wausau never, ever questioned that something happened that day. Every time you see in the claim notes or in any of his correspondence, he said, sure, Mr. Faulkner told me that he suffered some kind of a back sprain that day. He was not interested in the fact of the whether there was an injury on February 14th. He was interested in the medical causation issue, which was because this thing was late reported and there was a gap in time when Mr. Faulkner was off work for reporting it to his employer for seven weeks. Are these symptoms that have come to light tied to whatever it was that happened on February 14th? Well, let me look at that, because you have taken the IME confirmed that the claimant was injured. There was a medical problem. The doctor said he couldn't say what caused the medical problem. Your client knows that there was an episode. Something happened on February 14th. Correct, Your Honor. I've seen nothing that suggests your client knows of any other episode that could be, to which the injury could be attributed. The possibility is certainly there, as I speculated before, but I've never seen any evidence that your client identified something else that could have caused it. Actually, there is in the record, and it was the very reason why Mr. Smith ordered the MRI, counsel directed your attention to Volume 8, Exhibit 8, and in that volume at page 25, you will see the medical case manager, Lorraine Graham's, report. It indicates that the new information was the MRI. And she said, and again, she too assumed something happened on February 14th. And she says in her note that the modus of injury, she uses the letters M-O-I, modus of injury is consistent with a disc herniation, but the MRI is not consistent with an acute radiculopathy, which, you know, that's the medical terminology. And so she said he may well need surgery at that point. But she couldn't tell, she's a nurse, whether this was a causation, whether the February 14th incident was the triggering cause of the problem, or whether there's a degenerative back condition, hence Dr. Baker referred to it. Okay. So there's a state of uncertainty. Yes. What is it that changed so that by December, the company, presumably guided by its counsel, decides to fold his tent? I mean, I'm trying to figure out, in April, the fact of an eyewitness being available is identified. I think it's in June the witness statements are submitted to the Industrial Commission. What else is there that the company didn't have that it acquired by December, by which time it decided, okay, this claim should be accepted? During the litigation, there was a hearing on October 3rd. Mr. Faulkner testified, a previously undisclosed witness. Mr. Cobb testified. He was one of the men who submitted a statement that came to the ICA, came to Wausau in June to its counsel. He was subpoenaed to testify to get his story. And so by the time counsel's involved and he takes the deposition of Mr. Faulkner, he takes the deposition, he takes some testimony, didn't get the chance to take his deposition before the October 3rd hearing, he took the deposition of Mr. Faulkner on October, I believe, 23rd. That, too, is in the record. And, yes, he decided after all of that to fold his tent. And if you want to... I haven't answered the question. What is the additional information that caused the change? Not the process. What was the additional information that caused the change in position? That was the question. Well, certainly the testimony that came in. Mr. Faulkner testified in detail, apparently, about what, you know, the timing. The... Mr. Cobb was questioned about seeing Mr. Faulkner in pain after the February 14th incident. And so Mr. Cross, the counsel, got together with Dr. Bagan and said, look, I want you, again, to assume that there was an incident on February 14th. We've had some testimony. You know what the medical record was that you saw back when you issued your opinion. You know, and Dr., from Mr. Cross, the... So if you characterize the difference between the reason that was used to reject it, you characterize it as the expert didn't question that the event occurred. Correct. But had a question as to whether the particular injuries complained of came from that event. That's correct, Your Honor. The opposing counsel takes the position that that expert's opinion, he says that that was not based upon causation in terms of does it, you assume that the event happened on that date. But there's a problem with whether the maladies result from that. Correct. Whether the symptomology came. His view is no, it's just the opposite, that the reason that they followed it was because there was a question about whether the event, whether there was an injury on that date at work. And you're saying that was not in dispute. No, Your Honor. There's nothing in the record indicating that anybody questioned that. It's just a question of what the injury was. That's correct. Whether these symptoms. What the injury was or the severity of the injury. I think both the severity and what the injury was. As Ms. Graham pointed out on page 25 of Exhibit 8 in Volume 8, she said it looks like there's a progressive degenerative condition here. And that's what they asked the IME doctor to look at and he did so. And when the first report came back, at least in Mr. Smith's view, it didn't really address causation. And if you look at the May 15th. I'm really confused because we keep asking you what additional information the carrier learned. And the best I'm able to discern from this colloquy is there was a new witness produced, Mr. Faulkner, who was previously unknown to the adjuster. And Faulkner confirmed what apparently Zeigert would say, that he observed the injury occur there when it happened. And now you say he added additional information about the pain that Mr. Faulkner was complaining about shortly after the injury. Is that the additional information that suddenly tipped the balance of the scale and the carrier decided to accept the tender? The additional information included the three witness statements that did not surface until after the claim denial. Those were not received until something like in July. And according to Don Cross, the ICA counsel, the doctor said, you know, if these weren't the guy's drinking buddies or something like that, you know, maybe this testimony that somebody not just saw the incident, the other two witnesses didn't see the incident. They apparently observed that Mr. Faulkner was in some level of pain after the incident. And that was enough to tip the scales in counsel's view that if they went to hearing. Well, that's not really very much more than it corroborates the claim. But I'm not sure, I mean, this is summary judgment. I'm not sure on what basis we could properly say that a jury couldn't decide that, gee, the company had the key information and didn't investigate. That's enough to make out bad faith. What makes this, as a matter of law, a summary judgment? Because there is no evidence. For one thing, under Arizona law, you not only have to prove that there was objective unreasonableness, and we don't think any evidence of that. Well, let's see what we have here. We have the fact of the adjuster learning in early April that there was an eyewitness. The eyewitness was never contacted by the adjuster. We have a report from the doctor that says he's injured. I can't attribute it to any particular episode. The fact that he didn't report for a couple of months means it may have been something else. But there's nothing else that's identified. And, again, there doesn't appear to be a lot of investigation on the part of the company to try to figure out what else could have caused it. Now, that doesn't compel a conclusion that the company didn't properly investigate. But I'm not sure what basis there is for a court to say a jury couldn't conclude that the company didn't properly investigate. Even if the company was negligent, there is no evidence of this sort of ill will or bad intent that Arizona has struck down. Well, that may be punitive damages. It's also for liability, Your Honor, under Arizona law, that it's required of bad faith under Zilich and other cases. It is a two-pronged test. Even to get to bad faith, there is to get punitive damages, you have to show even more than that by clearing convincing evidence. Let me construct this. I'm not saying this would happen, but from the evidence, why it couldn't be inferred. The company gets an initial report from its expert. And from it, you can construe that report as saying, I know that you're having a difficult difference about what it said and what it meant. But if you can construe that to mean he's injured, but I don't really know whether he was injured on this day at work. I don't know whether he had this incident. So the company is aware that my expert needs some more information, and this is his big problem. And at that time, it also knows and has been given the name of an eyewitness that saw that occur at work at that day and knows that its expert is asking for information about this because otherwise he can't say that it came from such an incident. It doesn't investigate. It doesn't tell the expert. The expert gives another explanation consistent with the first, because there's nothing to show that it happened at work on that day. Why couldn't a reasonable fact finder say, you know, the company knew is relying on this expert, and they knew that this expert was looking for information about whether it happened on that day at work, knew there was an eyewitness, and they didn't tell their expert about it, and now they're relying on an expert's opinion that's based upon information that the company withheld from them. Why couldn't the jury say that's bad faith? Because I don't believe that the record supports the inference that Mr. Smith had any idea that the witness had anything relevant to say, because he had already told Dr. Began that an incident, a backstrain, occurred. Even if you look at Mr. Zeiger's statement, he's the only eyewitness to corroborate or to dispel the story that the claimant is telling as to how the injury occurred. How can Smith know whether he has anything relevant to say if he hasn't talked to him? Mr. Smith believed, Mr. Faulkner, that he got hurt that day. But if the first IME report is, I just can't tell without more information that it's linked to the injury, and the adjuster knows that there's another eyewitness who could tell him more than maybe the claimants told him about how the injury was sustained or how bad it was, why wouldn't the reasonable thing to do be to immediately contact Mr. Zeiger and see what he has to say? It might have been better, but the only thing that, and you can see what the additional information was that Mr. Smith gave. He gave a timeline, and the timeline says, date of injury, 2-14-08. And he gave the other dates, too, about the reporting and things like that in the first search for medical evidence. Okay. Well, but you told us that the reason that they changed their initials was because they had a, they were wondering about his credibility because he waited so long to make a complaint. So that seems to be based upon the idea that it, you know, it didn't happen then or it didn't occur there or his injuries didn't happen then because why, if it happened at work and his injuries come from that, why did he wait so long? Well, you mentioned credibility here, Your Honor, and that's an important concept because Mr. Faulkner testified before the ICA on October 3rd, and counsel had the opportunity to And it was shortly after that that the claim was accepted, and as in Judge Tallman's phrase, counsel recommended that they pulled their tent. Okay. You are over your time, Mr. Richland. My time is up. Thank you very much. No, that's all right. No, I don't mind going over if we're making progress here. But I will give your opponent a couple of extra minutes. Okay. Thank you. Thank you, Your Honors. Well, we just heard, in my view, confirms why this case must go to the jury. They were advised on April 30th that Mr. Faulkner needed surgery on an emergency basis. And then if you look at the IMU reports, I frankly don't see how you can draw any other conclusion, but certainly a reasonable jury could, that the only thing Dr. Begin had a about it, and then we go until December, until January, until ultimately he has surgery. And what we heard is nothing changed. The only thing that changed were confirmation of the events of the 14th, and they could have, they knew there was a witness and could have done that investigation, knew that's what mattered, and didn't do it. And that, we submit, is bad faith, or is at least sufficient to submit the issue of bad faith to the jury. And the timeline that was submitted, given what they knew Dr. Begin was actually looking for, was designed to mislead him. And still, even with that, he was unable to conclude one way or the other whether in fact the symptoms were related to the incidents of the 14th, only because he was unsure whether in fact something happened on the 14th. Was it whether something happened on the 14th or whether something else happened? Well, whether in fact hurt his back. That's the question. Well, I mean, you could have strained your back at one point and then fallen off a ladder and really hurt it at some other point. And I think it's the absence of another explanation. I'm not really sure why the doctor is supposed to be in a great position to answer the question, but he was asked the question. And he said, well, given the passage of time, I can't say for sure. Actually, Judge Clifton, when you look at his report, that's not what he says. What he says in the May 15th report, or at least a jury could find, is that if Mr. Faulkner did indeed suffer the injury as he has claimed, popped his back while passing it back to a co-worker, then his symptoms are consistent with that. That having pain some 30 days later, having increased leg pain upon return to work, that is consistent with what he reported. So we would ask the Court to reverse and remand for a trial on the merits of this  All right. Thank you both very much. The case is argued and submitted.
judges: Benavides, Tallman, Clifton